W. D. Nickolls v. E. C. Barnes et al.

[Filed June 30, 1891.]

**Landlord and Tenant:** Alleged Lease Construed. An instrument in the form of a lease was drawn up between W. D. N., as party of the first part, and E. C. B. and Mrs. E. C. B., as parties of the second part, whereby W. D. N. purported to lease to E. C. B. and Mrs. E. C. B. a certain hotel building from the 25th day of August, 1888, to the 25th day of August, 1889, E. C. B. and Mrs. E. C. B. agreeing to pay to W. D. N. as rent for said building $690, as follows: $50 cash, $55 on the 25th day of September following, and $55 on the 25th day of each and every month for the first six months, and $60 on the 25th day of each and every month during the last half of the aforesaid year. And it was agreed that the rent due or to become due should be a perpetual lien until paid, on all property of said lessees on said premises; and that upon the non-payment of the whole or any portion of the said rent at the time when the same is promised to be paid, or failure to keep any of the terms of said lease, the said W. D. N. might, at his election, either distrain or foreclose a chattel mortgage. This instrument was signed by E. C. B. and Mrs. E. C. B. and delivered to W. D. N., but was never signed by W. D. N. E. C. B. and Mrs. E. C. B. paid each monthly installment of rent up to and including that due December 25, on which day they abandoned the building, of which W. D. N. had notice. Thereupon W. D. N. brought suit for the rent to become due, and attached the hotel furniture of the tenants, the B.'s. On error, *held*, that the instrument claimed to be a lease not having been executed by W. D. N., vested no estate in the B.'s, they were only liable for rent for the time they actually occupied the building.

Error to the district court for Gage county. Tried below before Appelget, J.

*E. O. Kretsinger, G. A. Murphy,* and *A. G. Whitney,* for plaintiff in error.

*Hugh J. Dobbs,* and *A. Hardy, contra.*

Cobb, Ch. J.

This was an action of replevin brought in the district court of Gage county by W. D. Nickolls against E. C. Barnes and C. J. B.rnes, husband and wife, Smith W. Hill, Hugh J. Dobbs, Charles Moschell, and John Foster, constable, to recover certain personal property, consisting of household goods and furniture used in a hotel.

The plaintiff, in his affidavit in replevin (he appears not to have filed any petition in the case), alleges that he has a special interest in said goods by virtue of a chattel mortgage, and is entitled to the immediate possession of the same, etc.

The defendants, the Barneses and Hill, answered by a general denial. The defendant Foster answered and styles himself as a constable and alleged that on the 21st day of December, 1888, he received a writ of attachment issued out of the justice court of Gage county, Nebraska, from F. B. Sheldon's court, in a case wherein J. L. McGee & Co. were plaintiffs and Smith Y. Hill and Cynthia J. Barnes were defendants, and that defendant by virtue of said writ, at 4 P. M. of said day, attached the following goods, being a part of those replevied by the plaintiff in the above entitled action, to-wit: twelve high backed chairs, twelve dining room chairs, four tables, one stove, one side stand, one show case, seven chairs, and three stools, one mirror, and one clock, and took the same by virtue of said order of attachment; that as such constable, and by virtue of said writ of attachment, he claims to hold, and does hold, all of the above described goods, etc., and not otherwise.

The defendant Hugh J. Dobbs answered, disclaiming all interest in the property replevied or in said action.

There was a trial to a jury with a finding for the answering defendants other than the Barneses the following being the verdict:

"We, the jury impaneled and sworn in the above entitled cause, according to law, do find that at the time of the commencement of this action the right of property and the right of possession of said property was in the defendants C. J. Barnes and Smith Y. Hill, subject, however, to the lien of the attachment of the defendants McGee & Co.; and we further find that since the commencement of this suit the plaintiff, W. D. Nickolls, has purchased the interest of the defendants Barnes in said property, and said Barnes now has no interest in the event of this suit.

"And we further find that at the time this action was commenced the defendants, J. L. McGee & Co., had by virtue of their attachment proceedings, acquired a special interest in a portion of the property replevied herein and were entitled through the attaching officer to the possession of the same, and we assess the value of the property so attached at the sum of $132, and the value of the interest of McGee & Co. at the sum of $87.90, and we assess the damages sustained by McGee & Co., by reason of the detention of said property, at the sum of five cents.

"As to the defendant Smith Y. Hill, we find and assess the value of his interest in the property replevied in this action at the sum of $602.05, and we assess the damages sustained by said defendant Hill, by reason of the unlawful detention of said property, at the sum of five cents.

"As to the defendants Hugh J. Dobbs and Charles Moschell, we find that neither of said defendants owned or claimed to own or to have any interest in the property in dispute in this action at the time this suit was commenced; that no demand was made on said defendants for said property, and that such possession as they have been shown to have in this action of said property was lawful."

The plaintiff's motion for a new trial being overruled, the following judgment was rendered :

"It is therefore considered and adjudged by the court as follows, to-wit: That the defendants Smith Y. Hill and

C. J. Barnes have a return of the property taken on the writ of replevin in said suit, except that portion thereof hereafter in this judgment returned to J. L. McGee & Co., or in case a return of said property cannot be had, that the defendant Smith Y. Hill recover of and from said plaintiff the value of his interest in said property, to-wit, the sum of $602.05, also his damages for withholding the same, assessed at five cents, together with his costs, hereinafter taxed; and that the defendants J. L. McGee & Co. have a return of the property attached by said firm prior to the commencement of this suit, valued at the sum of $132, and their damages for withholding the same, assessed at five cents; or in case a return of said property cannot be had, that said defendants McGee & Co. recover of and from said plaintiff, the value of their interest in said attached property to-wit, the sum of $87.90 and their damages aforesaid, and costs hereinafter taxed; and it is further considered by the court that the defendants Hugh J. Dobbs and Charles Moschell be, and they are hereby, dismissed hence from this cause, and that they recover of and from the plaintiff their costs hereinafter taxed; and it is further considered by the court, that the defendants recover of and from said plaintiff their costs."

The cause was brought to this court by petition in error. Twenty-one errors are assigned, so many of which as it may be deemed necessary to discuss, will be examined. Upon the trial, W. D. Nickolls, the plaintiff, was called as a witness in his own behalf. He testified that he leased a building, No. 211 Court street, Beatrice, to Mrs. Barnes and Mr. Whitney for $55 per month for the first six months, and $60 a month for the last six months, for one year. In answer to the question, "Did you lease the property to Mrs. Barnes and C. E. Barnes?" he answered "Yes," and that he took security for the rent on all the goods in the house; that this security was in writing; that there was a written statement relative to the lease; that

they held possession there until the 25th of December; that they then left the building on the 25th of December. In answer to the question, "Did you receive rent from them for the three months they were there?" he answered "Yes," and again that he received pay from them up to the time they went out; that they did not say anything to him when they went out; that after they went out, and it must have been a week after they went out, a few days, any way, that he met Mr. Barnes at the corner of Court and Fifth streets, and he came up to me and handed me the key, and I told him I would take the key, but I would hold him for the rent of the balance of the year. The following lease was then introduced and read in evidence:

"This indenture, made this 5th day of September, 1888, between W. D. Nicholls, party of the first part, and E. C. Barnes and Mrs. C. J. Barnes, parties of the second part, witnesseth: That the said party of the first part, for and in consideration of the covenants of the said parties of the second part hereinafter set forth, do by these presents lease to the said parties of the second part the following described property, to-wit: The west one-half of lot three (3), in block sixty-six (66), being part of the brick building now on the lot, No. 211, namely the basement, first floor, and second floor, parties of the second part to keep the place that this lease covers in repair at their own expense. To have and to hold the same to the said parties of the second part from the 25th day of August, 1888, to the 25th day of August, 1889. And the said parties of the second part, in consideration of the leasing the premises as above set forth, covenant and agree with the party of the first part, to pay the party of the first part, as rent for the same, the sum of six hundred and ninety dollars ($690), payable as follows, to-wit: Fifty-five dollars cash and fifty-five dollars on the 25th day of September next, and fifty-five dollars on the 25th day of each and every month for the first six months, and to pay sixty dollars on the 25th day

of each and every month during the last half of the afore-
said year; party of the first part agrees to give parties of
the second part the first privilege of renting at the expi-
ration of this lease at whatever it will bring in any line of
business. The said parties of the second part further cove-
nants with the said party of the first part that at the
expiration of the time mentioned in this lease, peaceable
possession of said premises shall be given to said party of
the first part in as good condition as they now are, the usual
wear, inevitable accidents, and loss by fire excepted; and that
they will keep said premises in a clean and healthy condition
during said term, and pay rent when due without demand,
and will not sublet or release said premises without the
written consent of said lessor, and permit nothing disor-
derly or unlawful to be done thereon. And it is cove-
nanted and agreed that the rent due or to become due shall
be a perpetual lien until paid, on all property of said lessee,
on said premises, whether said property is exempt from
execution or not. And upon the non-payment of the
whole or any portion of the said rent at the time when the
same is above promised to be paid, or failure to keep any
of the terms of this lease, the said party of the first part
may at his election either distrain or foreclose as a chattel
mortgage for rent due and declare this lease at an end, and
recover the possession as if the same was held by forcible
detainer; the said parties of the second part hereby waiv-
ing any notice of such election, or any demand for posses-
sion of said premises. And it is further covenanted and
agreed between the parties aforesaid that the part of the
partition between office and dining room put in by the
parties of the second part, as built will be refunded in cash
by the party of the first part at the expiration of this lease
provided parties of the second part live up to the letter of
this lease. The covenants herein shall extend to and be
binding upon their heirs, executors, and administrators of
the parties to this lease.

" Witness the hands of the parties aforesaid, this 5th day of September, 1888.        E. C. BARNES.
                                    " MRS. C. J. BARNES.
    " In presence of
        "A. G. WHITNEY. "

Plaintiff further testified that he never consented that the premises should be vacated; that the goods which were replevied were in the building at the time the mortgage was taken; that E. C. Barnes and Mrs. C. J. Barnes signed the instrument, a copy of which was introduced as above; that on or about the 9th of January, 1889, plaintiff had an agreement with those parties and entered into a stipulation with them.   Paper is here handed to the plaintiff and he is asked whose signature is to the paper, and he answered, "that is Mrs. and Mr. Barness"; that he saw them sign it.   Plaintiff here offers paper which is offered and read in evidence, the following of which is a copy :

"This agreement, made by and between W. D. Nicholls, party of the first part, and Edward C. Barnes, Mrs. C. J. Barnes, and Val. Johnson, parties of the second part, witnesseth: For and in consideration of a settlement and compromise of the litigation now pending between the above parties in the district court and in the county court of Gage county, and the further consideration of the sum of $60 in hand paid by the party of the first part, and the following personal property turned out to the second parties by the party of the first part, as follows, to-wit: three smoothing irons, one silver castor, two feather beds, four pillows, one ash extension table, one cooking stove, one cupboard, one mattress, one coal hod, one spring W. W. bed, eight bed comforts, two table cloths, two tubs, one cane rocking chair, one ingrain carpet, one looking-glass, one plush parlor suit (green color), one piano, music rack, rug, and stool, receipt of said goods is hereby acknowledged, also said money.   And the said party of the first part hereby releases his chattel mortgage on said goods

above described; and the said parties of the second part hereby agree to dismiss the suit for damages against party of the first part now in the district court, and the case in replevin in the county court. And the said parties of the second part further agree to waive and convey to party of the first part all their right, title, and equity in all of the goods that were in said hotel on Court street on or about the 24th day of December, 1888, before any of said goods had been removed from said hotel, including all of the goods that were in use by the parties of the second part and one S. Y. Hill, except the goods hereinafter named. And we further agree that at the time said Nicholls brought said suit in the district court in replevin against E. C. Barnes et al. that he had a valid lien upon all of the goods in said hotel and that his lease was a valid lien and chattel mortgage on said goods, and that said lien had not been satisfied at the time said suit was begun in the district court against parties of the second part, S. Y. Hill et al. All claim for damages on bond for injunction in any case now pending is hereby waived by parties of the second part.

"Dated January 19, 1889.

"EDWARD C. BARNES.
"CYNTHIA J. BARNES."

That he turned over the goods and paid the money provided for in said paper; that after the Barneses moved out of the hotel on the 25th of December, 1888, plaintiff did not and could not rent it all until towards spring; that he rented it one month at $50; that after that it stood idle quite a time and he then rented it for a small sum; then it stood idle about three months; that he received $170 in rent from the other tenants that were in there during the remainder of the term the Barneses had leased the house.

An inventory of the property replevied in the case by C. F. Davis, sheriff, A. N. Barnett, deputy, W. A. Ryan, and W. F. Baker, appraisers, was here offered and re-

ceived in evidence. Plaintiff continuing, testified that he had received the money under the lease up to the 25th of December, 1888.

W. E. Ryan was sworn as a witness on the part of the plaintiff and testified that he was a furniture dealer and undertaker; that he was one of the appraisers in this case; that he was acquainted with the value of household goods and the value of furniture more than of dishes or stoves. He was asked the value of the goods appraised, and replied that the papers would show for themselves; that the valuation there was placed upon them he considered correct. On cross-examination he stated that he recollected selling certain goods to Mrs. Barnes. A paper is handed to witness and he is requested to examine it for the purpose of refreshing his memory. Witness stated that he sold Mrs. Barnes that bill of goods. He was handed another bill and asked if he sold that to her also. He answered, "Yes." Being requested to find said property on the appraisement, he answered: "Well, here it is, appraised at $20; it is an imitation cherry bedroom set; I sold it to her at $30; a few months before it was first-class and brand new; they were moved about and hauled back and tumbled in the door and trampled in the dirt, and of course they were not worth as much as when we sold them." Sold them one of these bills of goods November 24, 1888, and the other August 17, 1888. They were both new. Appraised a certain antique ash bedroom suit at $18; I sold it to her on the 24th of August, 1888, at $30. Appraised a certain woven wire—three-woven wire springs at $2 apiece, $6; she paid $10 for them. Appraised two cotton-top mattresses at $1 apiece; sold them to her at $3.50 apiece, but they were muddy and trampled all over. Appraised four antique oak extension tables at $30; she paid $50 for them. Appraised one dozen high back chairs, cane seats, at $12; sold them to her at $24. Appraised two sets of six perforated chairs at $2.50 per set; sold them to her at $5 or

$6 a set. Appraised one painted set of eight pieces at $20; sold them to her at $35. The pillow sheets, carpets, etc., were appraised at a lower rate than these; I thought they were second-hand, and they were appraised lower. Mr. Baker and myself took them in as small lots as possible and took their cash value under the hammer, as near as we could. They were appraised under the hammer."

This witness's testimony was corroborated, in the main, by W. F. Baker, also a witness on the part of the plaintiff.

H. J. Dobbs was sworn as a witness for defendants, and testified that although he had been sued as a defendant in this case, and had answered as such, that in point of fact he had no interest whatever in the case, nor had he at the time the property was replevied; that after the defendants Mr. Hill and Mrs. Barnes had quarreled, and Mr. Hill, as witness believes, had been turned out, he employed witness to protect his rights in this hotel property, but, after some days, and witness being about to bring suit and have a receiver appointed, Mr. Hazlett, who was employed by Mrs. Barnes, came to witness and they mutually agreed—witness for Hill and Hazlett for Mrs. Barnes—and they got them also to agree to divide and pay off their debts and quit business; that, in addition, witness was to take and hold Mr. Hill's part of the property, and Mr. Hazlett was to take and hold Mr. Barnes's, until it was sold and a settlement had between them and the debts paid; but when they came to make this division the officer who attached the property refused to let anything be done or allow anything to be moved until Mr. Hazlett and witness signed a receipt to him, in which they agreed to account to him for the property in case the suit was prosecuted and decided in favor of the plaintiffs in the action, and then he allowed them to take the property and go. Witness never had possession of the property that fell to Hill in that case, and he never saw it that he knows of. No demand was ever made on witness. The officer served him with the papers

a day or two after he had taken and stored it in this room, and witness thinks Mr. Hill had a key to the room where the property was stored.

Mrs. C. J. Barnes was sworn and examined as a witness for the defendants. She testified that she is one of the defendants in this case; that she is acquainted with the plaintiff and that Mr. Hill was co-defendant; that E. C. Barnes, also her co-defendant in this suit, is her husband; that she knows A. G. Whitney; that she had some business relations with him last summer a year ago, with reference to the hotel called the "Fantial Cafe"; that Mr. Whitney had opened the place as a restaurant and that witness went into partnership with him in the first place about the 5th of September, 1888; that she remained in partnership with Mr. Whitney about two weeks, then "we bought him out"; we were there from September to the 25th of December; that Mr. Hill was a partner "of ours"; he bought a half interest "of mine"; that witness did not know what interest her husband would have; that what was there was hers; witness owned the property. The following continuation of her examination I quote from the record:

Q. Now let us go back a little to the time you made the bargain with Mr. Nicholls about the renting of the premises; you may state what that bargain was.

A. In the first place, when we went in there we talked with Mr. Whitney and he said he had the place rented and we moved in with him. It did not take very long to find out what kind of a man he was, and he didn't have the property rented at all, and I wouldn't live in there with him, and so we bought him out.

Q. Mrs. Barnes, did you read this lease when you signed it?

A. It was partly read to me; I undertook to read it, but I was in a hurry and I asked Mr. Nicholls to read it and he read a part of it, but he did not read it all.

Q. What part did he not read out?

A. What he calls a renter's lien; that part he did not read to me—or landlord's lien.

\*      \*      \*      \*      \*      \*      \*

Q. Just state to the jury what you knew about that clause being in that lease, and if when you signed that lease you knew you were putting a chattel mortgage upon all the property in that building?

A. No, sir, I never heard of the landlord's lien; we have leased our own property, and leased to and from other parties, and I never heard of such a thing. I know a little too much to sign a chattel mortgage on all I have in the house for such a business as was there, I think I do.

\*      \*      \*      \*      \*      \*      \*

Q. When did you first learn that he claimed to have a mortgage on your property for the rent not yet due?

A. About two weeks before we came out of the hotel.

Q. How did you learn that?

A. Mr. Hill learned it somewhere; and I said it was not so, and then he went and brought me the lease and showed me.

\*      \*      \*      \*      \*      \*      \*

Q. Just state the circumstances under which you came to sign this lease?

A. Well, we leased the property for a year so that we could have the use of it for a year, and I supposed it was a common lease; that is all I ever knew about it.

Q. Do you remember the time you signed it?

A. It was a few days after we bought Whitney out.

Q. Do you know why Mr. Nicholls did not sign this lease at that time?

A. No, sir, I do not.

\*      \*      \*      \*      \*      \*      \*

Q. By the court: Did you sign that paper of your own free will, or was it under compulsion?

A. No one made me sign it.

Q. Do you know anything about any property being unloaded into your hotel on the 24th of December, 1888?

A. It was unloaded on the 25th, the morning of the 25th; Christmas morning.

Q. Did you know anything about it?

A. Yes, sir.

Q. Was it on the morning of the 25th or the morning of the 24th that your piano was brought back?

A. It was on the morning of the 25th.

Q. Where was it put?

A. In the office.

Q. Was it carried upstairs and put back where it was taken from?

A. No, sir; it was taken from the parlor and put back into the office.

Q. Who put it in the office?

A. Mr. Nicholls had his drayman and a policeman.

Q. Did Nicholls, when he put it in there, claim to have any interest in the piano or other property?

A. Yes, sir.

Q. What claim of ownership did he have?

A. The lien, he said; the landlord's lien.

Q. What did he do towards guarding the property?

A. He placed a man in the office there who stayed there night and day, and he had a couple of men around the house—one at the back door all night; he was there when any one went out.

\*        \*        \*        \*        \*        \*        \*

Q. State whether it did interfere.

A. Yes, sir, he had the back and front door locked a couple of days.

Q. Who locked the doors?

A. I believe a constable; I don't remember who he did have do it.

Q. Just state when did he have the doors locked.

A. Christmas morning; they were locked some time during the forenoon.

Q. When did he have the back door locked?

A. He had them all locked at the same time.

Q. Were they locked all day Christmas?

A. Yes, sir. No, not all day; they were locked till Lawyer Hazlett told me to unlock them.

Q. You went and consulted Mr. Hazlett?

A. Yes, sir.

Q. What did you do after you consulted Mr. Hazlett?

A. We unlocked the doors.

Q. What time did you commence to move the property out of there on Christmas day?

A. I think it was about 7 o'clock in the evening.

Q. Now just tell the jury how you came to move it at that time.

A. We were invoicing all day from early in the morning, and as soon as we got through invoicing we began moving after we divided it up.

\*          \*          \*          \*          \*          \*          \*

Q. How many rooms were there in that house that was furnished and fitted up as bedrooms?

A. There were six.

Q. Was there any other rooms besides these six that was fitted up as bedrooms?

A. No, sir, only the downstairs rooms that we used for our own use.

Q. Did you have the parlor upstairs?

A. Yes, sir.

Q. Was that fitted up with furniture?

A. Yes, sir.

Q. What was the character of most of your furniture that was partnership furniture and used in the hotel there?

A. Bedroom furniture, carpets, dishes, dining tables, and things that are used in such a place.

Q. About when was the most of it bought?

A. The principal part of it was bought in September, new.

Q. That you bought of Whitney, do you know when that was bought?

A. All we bought of him was new two weeks before.

\*        \*        \*        \*        \*        \*        \*

Q. Do you know what the property was worth at the time you moved out and divided up the partnership property? Just answer yes or no.

A. Yes, sir, I think I do.

Q. What was it worth?

A. Between thirteen and fourteen hundred dollars.

Q. Who owned that property.

A. I owned one-half and Mr. Hill the other.

Q. At the time you sold out to Hill what did he pay you for the half of it?

A. Five hundred and thirty dollars.

Q. That was a cash payment?

A. Yes, sir.

Witness's attention was called to certain papers marked "Exhibits A, B, C, and D," which she identified as a bill of sale, which bill being introduced in evidence appeared to be a bill of sale and partnership whereby C. J. Barnes, on the 18th day of October, 1888, in consideration of the sum of $515, the receipt of which he acknowledged, bargained, sold, and delivered to Smith Y. Hill the undivided one-half of all personal property contained in the schedule thereto attached, located in the building numbered 211 Court street, Beatrice, as well as an equal copartnership in the business of running a restaurant and hotel at the above named place, etc. Then follows a list of articles of furniture, dishes, and other personal property, amounting to $———.

Witness's examination being continued, she testified that this property "was worth very near what it was when we put it in there;" it was new and had been used only about two months. The testifying defendant here identified the articles contained in the bill of Ryan Brothers, consisting

16

of articles of furniture with their value, amounting to $145.75; also another lot of furniture received by defendants from said Ryan Brothers with prices attached to each article, amounting in the aggregate to $122. She testified that the articles embraced in Exhibit "C" were in her opinion worth at the time of the taking, $125, and that the other bill was in her opinion, worth at that time $100. She also testified that the articles embraced in the second bill of Ryan Brothers were taken under the writ of replevin; also that the articles contained in the bill of Ryan Brothers, marked Exhibit "C" were also taken under the writ of replevin. Here witness stated that she was acquainted with the value of the parlor furniture which she had at that time, and that it consisted of seven pieces; a parlor set of green plush, and that it was worth $90; that she had a considerable number of chairs in the hotel besides those she bought of Ryan; that those not included in her estimate of twelve cane chairs and the twelve perforated seat chairs which she bought of Ryan Brothers, those not estimated in her former previous estimate, were worth seventy-five cents apiece.

Counsel here requests witness to take the inventory made between herself and Mr. Hill, and to take it item by item and state what each article was worth at the time they were seized in this replevin suit. To Mr. Kretsinger she said that the inventory was made by herself and Mr. Hill together; that part of it was in Mr. Barnes' handwriting. Witness, in further answer to question, gave the name, number, quality, and value of a long list of articles from said inventory.

Upon cross-examination she also stated that all of the above property given by her was partnership property, on the 26th day of December, 1888, it was owned by herself and Mr. Hill as partners.

The defendant Smith Y. Hill was also sworn and examined as a witness on his own behalf, and stated that he

bought his interest in the goods from, and was running the hotel in partnership with, Mrs. C. J. Barnes; that from her he bought a half interest in the goods and business and that he dealt with her entirely; took a bill of sale from her at that time for the half interest in the goods; that the bill of sale contained an inventory of the goods at that time of what was then in the house. Counsel hands Mr. Hill defendant's Exhibit "B," and asks him whether that is the inventory of the goods that was taken there at the time he bought in. He answered, "That is the invoice," and the bill of sale from Mrs. Barnes to witness, and that he purchased the property, including two bills of Ryan Bros. that are here, that are not in the invoice, except that portion of them which was paid; the unpaid portion witness paid to Ryan Bros.; there was a little over $200 unpaid which he afterwards paid to Ryan Bros. and Baker.

Mr. Hill contradicted and denied the testimony of the witness Whitney, and also that of Mr. Nickolls, in regard to having conversation with him and warning him not to buy in with Mrs. Barnes; also that of Nickolls in regard to the conversation which Nickolls stated took place between them previous to Hill buying in, but stated that when he was talking of buying in, he went to Nickolls and told him that he was talking of buying a half interest in it, and he said, "You can't do it, I have got them tied up so they can't sublet the lease," and says I "have you got them tied up so they can't take a partner?" and he gave himself a kind of a jerk, and he said, "You come around in two hours and I will tell you;" that he went up to his office in two hours and he was away; afterwards that he met Nickolls on the street by the National Bank and said, "Nickolls, have you come to a conclusion about that?" and he said, "It is all right, go ahead, go ahead." That Nickolls never told him at any time that he had a mortgage on the property; that he (Hill) first learned of the mortgage on

the property after McGee & Co. commenced the attach-
ment suit in December, when Frank Morrison told him;
that he (Hill) then went and told Mrs. Barnes.   Mr. Hill
further testified that to the best of his knowledge there
was $60 worth of goods placed in the house after he bought
in; that everything was paid up when he took possession,
and those were goods purchased subsequently; that there
were $200 worth of goods which had been bought from
Ryan Bros. and Baker, but which had not been paid for.
Mr. Hill testified that he paid for these $200 worth of
goods, and in addition thereto, the amount of $60 for other
goods, and that all these goods included in both amounts
were in the house and replevied by the plaintiff; that he
was acquainted with the value of the goods that were re-
plevied; that his half of them was worth about $640 to
$650; that the total value of the partnership goods was
about $1,300; that no demand was made on him by the
plaintiff for these goods.   He further stated that the most
of the goods were new, and just out of the store only a
short time when he went in there and they were kept in
good condition while he was there; in good condition—his
half of them; when he stored them he took pains to prop-
erly store his part of them; they were stored carefully
so as not to damage them.

   L. E. Wheeler was sworn as a witness on the part of
the defendants, and stated that his business was that of
keeping a hotel; had lived in Beatrice about ten years;
was acquainted with the parties; that he assisted in mak-
ing the inventory preparatory to the division of the goods
between Mrs. Barnes and Mr. Hill; just before the defend-
ants commenced moving the property witness divided the
property, as nearly even as possible, and gave each party a
share of certain kinds of goods, and tried to give them an
equal share of the bed-room sets; that he made an appraise-
ment as he went along and took notes of the property so
that he could testify as to its value; that in his opinion

Nickolls v. Barnes.

each share of the property as divided by him was worth
something over $625, from that to $650, the whole of it
worth about $1,300, possibly a little more or a little less;
that the majority of the furniture was just as good as new
—as it was in the store; the bed-room sets, carpets and bed-
ding, most of it was new; the bed-room sets were all new,
except one or two; the tables were new and all of the best
quality; the chairs were new and very expensive, that is
the dining-room chairs, thinks they sold at $36 a set; the
dishes were good and the silverware was good.   Witness
has had a good deal to do with the handling of such prop-
erty, and knows the value of such goods; has been an
auctioneer a good many years and as such has sold large
amounts of that kind of property.

Mrs. Barnes, being recalled on the part of the defend-
ants, testified that neither Mr. Nickolls, the plaintiff, nor
any one for him, ever made any demand on her for the
rent.   Counsel handed witness a paper and asked her to
look at that appraisement and give the value of the prop-
erty.   She stated that she knew about those goods; that
they were part of the goods taken from her by the plaint-
iff in this action.

By the Court: Do you know those goods named in that
memorandum were goods you had in your house and be-
longing to you and Mr. Hill?

Witness answered: "Yes, sir, I helped the constable
make this memorandum out and named the goods to him,
and know that they are the same goods that were taken by
the plaintiff in this action of replevin."   She stated they
were twelve high-backed dining-room chairs, $24; they
are appraised at $12 here.   Twelve perforated chairs, $14;
here it is $12.   Three eight-foot tables and one ten-foot;
they were worth $50.   Three cane-seated chairs, they were
worth $10, they are valued at $5; one stove worth $14,
valued at $4 here; one side stand, $3; one show-case, $7;
one mirror, $3; one office clock, $7; that the valuation

here given by witness was a fair value at the time they were taken; that there was no demand made on her by the plaintiff or any one else in his behalf for the property which he took in this action.

The following instruction was given by the court at the request of the plaintiff, who excepts to the addition thereto made by the court:

The court instructs the jury that if you find that Hill bought a half interest in the goods and chattels in dispute after he had knowledge of Nickolls' chattel mortgage, or after said chattel mortgage was filed with the county clerk, Hill cannot recover in this case, and you will find for the plaintiff.

Court adds: Unless you further find from the evidence that at the commencement of this action the plaintiff had no subsisting lien or mortgage against the goods purchased by defendant Hill.

The following instructions were given by the court at the request of the defendants, to which the plaintiff excepted:

I. The court instructs the jury that the chattel mortgage clause in the writing, purporting to be a lease between plaintiff and defendants Barnes, provides that "upon the non-payment of the whole or any part of said rent, at the time when the same is above promised to be paid, etc., the said parties of the first part may, at his election, foreclose as a chattel mortgage for rent due, and declare this lease at an end and recover possession." This provision limits the plaintiff's right to foreclose the mortgage for rent due, only whether plaintiff was entitled to possession of the property described in the chattel mortgage depends on whether there was rent due at the time he did so. If there was rent due he had such right, and if not he had no such right.

II. The court instructs the jury that if they shall find from the evidence that no rent was due the defendant when he commenced this action, then he cannot recover herein,

for the commencement of this action was an election on the part of the plaintiff to terminate a lease, and he cannot recover for rent not due when he by this act terminated the lease.

III. The court instructs the jury that the defendants, J. L. McGee & Co., having attached a portion of the property in controversy before the commencement of this action, and proceeded to judgment in their attachment suit, on which was issued an order of sale for the property by them attached, if you shall find enough of the property in controversy in this action, to which the plaintiff Nickolls was not entitled to the possession at the commencement of this action, to satisfy said order of sale, then J. L. McGee & Co. will be entitled to a verdict for the full amount and for their said order of sale, and interest thereon at seven per cent to this date, provided the property attached amounts to that sum at its fair value.

IV. The court instructs the jury that if you shall find from the evidence that the plaintiff, before any rent was due him, took possession of the building leased to defendants, or of a portion thereof, in such a manner as to interfere with the defendant's use and occupation of the same, then this would be a violation of the contract on his part, and would excuse the defendants from paying any more rent for said building under said contract, provided they vacated the same within a reasonable time thereafter.

V. The court instructs the jury that in case you find the issue in this case for the defendants, it will be necessary for you by your verdict to adjust the rights of the several defendants; that neither the defendant Charles Moschell or Hugh J. Dobbs have or claim any interest in or ownership of the property in dispute, and in your verdict you cannot assess any damages to said defendants for the property taken; that since the commencement of this action the defendants Barnes have sold and released all their right and interest in and ownership of the property in

dispute, and in your verdict you cannot assess any damages to defendants Barnes for the value of the goods taken.

As to defendants McGee & Co., should you find the issues for defen·lants, you will assess the value of their interest in the goods replevied at such sum as by the evidence they may be entitled to, not exceeding the sum of $87.90, provided the goods attached amount to that sum, with damages for the lawful detention of property; and as to defendant Hill, the court instructs you that should you find all the issues for the defendants, then the interest of said defendant Hill in the goods replevied would be the value of one-half the entire stock of goods taken, after deducting from the total valuation of the goods taken, the value of the interest of McGee & Co., and you should, by your verdict, determine the value of the interest of said Hill in said goods, and also determine the amount of damages said Hill has sustained by reason of the unlawful detention of such property.

VI. The court instructs the jury that as a matter of law where rent is payable at stated periods in advance, the lessee or tenant has the whole of the first day of that period in which to pay such rent.

Thereupon, the court upon its own motion delivered the following instructions, to which, also, the plaintiff excepted:

I. The court instructs you that this is an action of replevin, brought by this plaintiff against these defendants for the recovery of a quantity of household goods, of which he claims to be the owner, or to have a special ownership of, by virtue of a certain lien or mortgage given him by the defendants E. C. Barnes and C. J. Barnes.

II. The court further instructs you that the consideration for which this lien or mortgage was given by the defendants Barnes to plaintiff, was to secure certain rents agreed by said Barnes to be paid to plaintiff.

III. The court further instructs you that the nature and purpose of an action in replevin is for the recovery of specific property, and that to entitle the plaintiff to recover, two things are necessary, to-wit, the plaintiff must either be the owner of the property in question or he must have a special property, in the same, and he must be entitled to the possession thereof at the time of the commencement of this action, and the defendants must have either wrongfully and unlawfully taken the property, or they must have wrongfully detained the same after a lawful taking.

IV. The court further instructs the jury that under the instrument called a mortgage in this case, the plaintiff's right to the possession of the property in controversy was dependent upon the fact that there was rent due and unpaid.

V. The court further instructs the jury that the commencement of this action was an election on the part of the plaintiff to declare the lease or contract of rental at an end.

VI. The court further instructs the jury that if you shall find from the evidence that the plaintiff, at the time of the commencement of this action, was the owner of the goods in controversy, or that he had a special ownership in the same, and that he was entitled to the immediate possession of the same, then your verdict will be for the plaintiff.

VII. But if, upon the other hand, you shall find from the evidence that the plaintiff was not the owner of the goods in question, nor had a special interest in the same or that he was not at the commencement of this action entitled to the immediate possession of said goods, then you will find for defendants, and assess their damages at such amount as you shall find from the evidence was the value of the goods at the time they were replevied and taken from the defendants.

VIII. The court instructs you that defendants have not introduced any evidence to establish a claim for damages

for the wrongful detention of the goods in controversy; you cannot find to exceed five cents for the wrongful detention of the goods by the plaintiff, in addition to the value of the goods, if you find the issue in favor of the defendants.

The following instructions by the plaintiff were refused:

I. The court instructs you that the filing of the chattel mortgage by plaintiffs was notice of plaintiffs' rights to all the world, and that neither defendants Hill nor McGee & Co. have any right to the property that can interfere with plaintiff, if their right accrued after such filing of the chattel mortgage, or after they had notice of the existence of such chattel mortgage of the plaintiff.

II. The court instructs you that in all cases of leasing, to show a surrender, a mutual agreement between the lessor and the original lessee that the lease is terminated must be shown. In this case it must be clearly proved that Barnes assented to the termination of the term of the lease, and that Nickolls and Barnes mutually agreed to a surrender of the term, and that both Nickolls and Barnes agreed that the lease should end and rent stop December 25, 1888; unless you do find that there was such a mutual agreement, you will find for the plaintiff. Plaintiff to release them from their lease. Court adds, or did some other act that operated as a termination.

III. As to what would amount to an acceptance on the part of plaintiff of a surrender of the lease and his right thereunder, I instruct you that his acceptance of the key after defendants had vacated the premises, and a re-entry by himself and leasing the premises to other tenants during the term, would be no presumption that the plaintiff had released defendants from their lease. He would have a right to rent the building, because if rented, it is so much saved to the first tenants.

There must be something more on the part of the plaintiff to constitute a release of defendants and a surrender of

Nickolls v. Barnes.

the lease, and on this branch of the case the burden of proof is on the defendants to show that the plaintiff agreed to release them.

The question as to whether the instrument given in evidence as a lease or chattel mortgage was or was not void by reason of not having been signed by the lessor or mortgagee, will be considered as sufficiently raised by the plaintiff's exception to the addition made by the court to the first instruction given at the request of the plaintiff.

By this addition to the instruction, the court told the jury, in effect, that they might find from the evidence that at the commencement of the action the plaintiff had no subsisting lien or mortgage against the goods purchased by defendant Hill. By reference to the body of this instrument, as hereinbefore copied, it will be seen that by its terms the defendants, the Barneses, being the parties of the second part to said instrument, agree to pay the party of the first part as rent for the said premises the sum of $690, payable as follows: Fifty-five dollars cash down, fifty-five dollars on the 25th day of September following, and fifty-five dollars on the 25th of each and every month for the first six months, and to pay sixty dollars on the 25th day of each and every month during the last half of the aforesaid year. It is in evidence that the defendants paid the rent, all that the plaintiff claimed, in advance up to the 25th day of December. During all this time they occupied the premises, had they not paid the rent plaintiff would have had a just demand and right of action against them for use and occupation, regardless of the question of the legality and binding force of the instrument we are now considering. The evidence is further clear that the defendants gave up and left the premises, or, in the language of the plaintiff, "pulled out," on the 25th day of December. The liability of defendants to the plaintiff for rent after that date, there being no use or occupation of the premises on the part of the defendants, must depend upon the binding force

of the instrument.   The instrument purports on its face to be a deed *inter partes*, the plaintiff being the party of the first part; by it the plaintiff, as party of the first part, purports to create an estate, a leasehold estate, in the parties of the second part in consideration of their covenants, which come later.   This could only be done by the proper execution of this instrument by said party, which never was executed, nor does it purport to be, by him.   Hence it need scarcely be said that such leasehold estate in the defendants, the Barneses, never was created, and it therefore follows that their occupancy of the premises was as tenants at will or by sufferance, and that they were only liable for rent for the time they actually occupied them. (*Swatman v. Ambler*, 8 Exch. [Eng.], 72; *Pitman v. Woodbury*, 3 Id., 3; *Cromelien v. Thiess*, 31 Ala., 412.)

If, then, by reason of the failure of the plaintiff to execute this instrument as a lease, the defendants failed to give the consideration for which they agreed to secure the plaintiff in the payment of the rent, the instrument is certainly void as a chattel mortgage.   In saying this I pass no opinion upon the effect in law of such an instrument if duly executed by both parties.   Therefore the court did not err in thus altering the instruction given, and it would have been error on the part of the court to have given the instruction as requested by the plaintiff.

The several instructions given at the request of the defendant, and the giving of which is assigned for error, were called for by the facts produced in evidence by the plaintiff and defendants.

As to numbers 1 and 2 of such instructions, the law there given by the court to the jury follows as a matter of course; the law above stated is applicable to the change by the court of plaintiff's first instruction.

Number 3, given at the request of the defendants, applies to the question raised between the attaching creditors· of the defendants and the plaintiff, and from what we

Nickolls v. Barnes.

have said, it follows that the plaintiff, having no legal lien upon the goods of defendants, they were liable to attachment on the part of their creditors, and the instruction was properly given.

As to number 4, we have seen that the defendants ceased to occupy the building in question on the 25th of December, and there was no rent due under the terms of the void lease until the expiration of that day. There was evidence before the jury, though probably not contained in our copious extracts from it, that before the expiration of that day, and consequently before any rent was due the plaintiff, he took partial possession of the premises for the purpose of storing goods. The facts appear to be that the defendants, the Barneses, having sold out one-half of the hotel furniture as well as one-half of their right of possession, whatever that may have been, to the defendant Hill, and they having failed to get along together as partners, had, on or shortly before the said 25th of December, agreed to divide the hotel furniture and goods and cease to occupy the hotel, and in pursuance of that agreement had divided up the property and moved the whole or a part of it out of the house, and that some time in the night of the 25th, whether before or after midnight does not seem to be clearly established, the plaintiff seized the whole or a portion of said goods, either under proceedings in replevin or otherwise does not clearly appear, and brought them to the hotel and stored them there and set a man to watch them and see that they were not carried away by the defendants or any other persons. It is the evidence of these facts that must apply to instruction number 4, given at the request of the defendants. I pass no opinion upon that instruction further than to say that the verdict will not be disturbed by the reason of the giving of it. The instruction numbered 5 was necessarily given to instruct the jury in their duties as regards the several parties to the suit, and there was no error in its giving.

Instruction number 6 of this series, although complained of in the petition in error, is not discussed in the brief, and is believed to have been correctly given.

Plaintiff in error complains of all these instructions that they were not based upon the evidence in the case. I do not think this objection to be well taken, but the space at my disposal will only permit of my referring generally to the evidence as herein set out as the ground of my belief. The argument of counsel for plaintiff in error on this branch of the case assumes that the paper introduced in evidence, which is sometimes termed a chattel mortgage and sometimes a lease, was an executed and perfect instrument. If I believed him to be correct in this assumption I would quite incline to agree with him in his conclusions; but as I have already stated, that instrument not having been executed by the lessor or mortgagee, and as it purports by its terms to grant a leasehold estate in the premises, must be considered void and is so held. Therefore these charges of the court, and especially number 5, wherein the court tells the jury that the commencement of this action on the part of the plaintiff was an election on his part to declare the lease or contract of rental at an end, while possibly not strictly and technically correct, yet, considering the void character of the instrument relied on as a contract of rental, will not be held as unjust to the plaintiff in error nor sufficient to demand a reversal of the judgment.

Again, counsel contends that these series of instructions were erroneously given for the reason that they are inconsistent with instruction number 8, given on behalf of the plaintiff. That instruction is not set out here for the reason that having been given at the request of the plaintiff in error, its giving was not excepted to by him nor assigned for error. I here copy the said instruction:

"You are instructed that the paper offered in evidence by the plaintiff, signed by Mr. and Mrs. Barnes, made about January 19, 1889, was a ratification of the other in-

strument of September 5, 1888, and a complete settlement and accord and satisfaction by and between the plaintiff and Mr. and Mrs. Barnes of all their property rights involved in this action, and Mr. and Mrs. Barnes cannot avoid their signatures of said instrument of September, 1888. Neither can any of the defendants insist that the signatures of Mr. and Mrs. Barnes to either of the said instruments are not binding on Mr. and Mrs. Barnes, but you are instructed that such signatures are binding on the parties who made the signature."

The Barneses having settled with the plaintiff and executed and delivered to him the release dated January 19, are of course bound by their signatures to it; but neither of the other defendants were so bound, their rights having accrued before the execution of said instrument. I cannot conceive that the trial court, in giving the instruction, could have intended to give the signature of the Barneses any such retroactive effect as to the other defendants; if it did, while the instruction would be somewhat inconsistent with the other instructions, its giving would not be reversible error, as even with it before the jury no other verdict could have been given.

The series of instructions given by the court on its own motion are believed to be free from error and to correctly present the case to the jury. Plaintiff in error also complains of the refusal of the court to give instructions numbers 1, 2, and 3, as herein copied. After what has been said, it is unnecessary to repeat that the theory upon which the instructions were asked is believed to be false, and that no error was committed in refusing them. The judgment of the district court is

AFFIRMED.

THE other judges concur.